DECISION
Russel J. Aubin, D.O. ("Appellant") appeals from a decision of the Rhode Island Board of Medical Licensure and Discipline ("Board") revoking his license to practice medicine in this state due to unprofessional conduct in violation of G.L. 1956 § 5-37-5.1. The Appellant seeks to have the Board's decision reversed and his license to practice reinstated. This Court has jurisdiction over this administrative appeal pursuant to G.L. 1956 § 42-35-15.
 FACTS AND TRAVEL
On December 29, 2004, the Board received notice that Kent County Hospital in Warwick, Rhode Island, had suspended the Appellant, a doctor of osteopathy and a practicing anesthesiologist, from its medical staff following an investigation into allegations that the Appellant had sexually molested a patient — a twenty-one-year-old female college student undergoing knee reconstruction surgery ("Patient A"). (Tr. 2/18/05 at 70.) The Appellant had provided anesthesia during her operation on December 23, 2004. (Tr. 2/18/05 at 70.)
After a preliminary investigation pursuant to sec. 5-37-8, the Rhode Island Director of Health issued an order summarily suspending appellant's license to practice medicine in this state, effective January 11, 2005.[1] As required by statute, the Appellant received a hearing to appeal the Director's decision. The hearing commenced on February 18, 2005 and continued over a total of twelve sessions held on various dates over the next six months. The final evidentiary session of the hearing occurred on August 17, 2005.
 Testimony of Patient A
Patient A first encountered the Appellant in the preoperative anesthesia unit on the morning of the actual surgical procedure. During their meeting, Patient A elected to receive a spinal anesthetic, which would leave her conscious during surgery. (Tr. 2/18/05 at 78-79.) Although the Administrative Decision notes that Patient A "chose to receive a spinal anesthetic so she would remain awake during the procedure" (Administrative Decision at 3), the record indicates that Patient A did not choose the spinal anesthetic because of any particular preference to stay conscious for her surgery. (Tr. 2/18/05 at 103.) Hospital staff moved Patient A to the operating room where she alleged surgeon Danny E. Humbyrd, M.D. commenced the surgical procedure. During the procedure, Patient A was wearing a blue johnny[2] while lying flat on a surgical table with her legs extended. (Tr. 2/18/05 at 75, 77.) Hospital staff placed a vertical surgical drape between Patient A and the surgeons. (Tr. 2/18/05 at 76.) This drape was located at or around Patient A's navel and extended to a height of approximately one and a half feet above Patient A so as to preclude her from seeing the surgeons and vice versa. (Tr. 2/18/05 at 76.) The initial part of the surgery involved an arthroscopic[3] examination of Patient A's knee. (Tr. 2/18/05 at 78.) One of the surgeons had the surgical drape lowered during the arthroscopic procedure, so Patient A could see that part of the surgery on a television monitor. (Tr. 2/18/05 at 78-79.) The Administrative Decision noted that someone removed this monitor, but Patient A did not testify to this fact. (Administrative Decision at 4.)
Patient A testified that she was awake, alert, and speaking to Dr. Humbyrd during the arthroscopic procedure. (Tr. 2/18/05 at 78.) At this point in the surgery, the Appellant was with Patient A at the head of the table on her side of the surgical drape. (Tr. 2/18/05 at 83.) After the surgeons completed the arthroscopic portion of the operation, hospital staff raised the surgical drape so that Patient A could not see the more invasive portion of the surgery. (Tr. 2/18/05 at 86.) Patient A stated that once hospital staff had repositioned the surgical drape to occlude her view of the surgeons, the Appellant began to massage her neck and shoulders with both hands. (Tr. 2/18/05 at 83-84, 86.) According to Patient A, she did not feel any pain and had not requested the massage. (Tr. 2/18/05 at 84.) Instead, she stated that she felt confused by the Appellant's actions, because she was not sure if the massage was part of the surgical procedure. (Tr. 2/18/05 at 84-85.)
The Appellant then allegedly began to touch her breasts under the johnny while asking if she had a boyfriend. (Tr. 2/18/05 at 86, 89.) Although the Administrative Decision found that they also talked about Christmas shopping (Administrative Decision at 20), Patient A did not recall having that conversation. (Tr. 2/18/05 at 117-118.) Patient A then testified that the Appellant bent down close to her face and told her not to tell anyone. (Tr. 2/18/05 at 87.) Otherwise, he could lose his job. (Tr. 2/18/05 at 87.) Patient A asked the Appellant if he did this all the time, to which he replied, "No, I just couldn't control myself." (Tr. 2/18/05 at 87-89.) The Appellant told her at least three times that he would get in trouble if she told anyone. (Tr. 2/18/05 at 88.) After her conversation with the Appellant, Patient A fell asleep and did not awaken until hospital staff members were moving her from the operating room to the recovery room. (Tr. 2/18/05 at 89-90.) Patient A awoke in the presence of two nurses, one male and one female. (Tr. 2/18/05 at 90.) After the male nurse left, Patient A told the female nurse what had transpired in the operating room. (Tr. 2/18/05 at 90.) The nurse then reported the incident to hospital administrative staff, who in turn asked Patient A to retell her story. (Tr. 2/18/05 at 91.) Patient A would recount her story several times that day. (Tr. 2/18/05 at 92.)
On cross-examination, the Appellant' s counsel questioned Patient A about whether she mistook the Appellant's hand ling of the EKG leads and electrodes[4] on her body for his having fondled her breasts. (Tr. 2/18/05 at 111-113.) Patient A acknowledged that the Appellant reached under her johnny to attach leads to electrodes on her chest for monitoring purposes. (Tr. 2/18/05 at 111-112.) She testified that when he attached the leads, the Appellant acted professionally and appropriately. (Tr. 2/18/05 at 117.) Patient A clearly recalled that the Appellant assaulted her only after the arthroscopic examination ended and hospital staff raised the surgical drape. She testified that at the time of the alleged assault, two female nurses and the surgeon were working on the sterile side of the drape, while she and the Appellant were alone on the non-sterile side. (Tr. 2/18/05 at 123.) Patient A seemingly did not recall the presence of assistant surgeon Michael Infantolino, M.D. during her operation. (Tr. 2/18/05 at 124.) Patient A also did not immediately alert others that the Appellant was acting inappropriately until several hours following the surgery. (Tr. 2/18/05 at 137.)
 Testimony of John R. Audett, M.D
At the time of the incident, Dr. Audett was the Vice President for Medical Affairs at Kent County Hospital at the time of the incident. (Tr. 2/24/05 at 3.) Dr. Audett testified that when he learned of Patient A's complain t, he immediately initiated an investigation. (Tr. 2/24/05 at 6.) He interviewed the postoperative nurse, the circulating nurse stationed in the operating room during the surgery, Dr. Humbyrd, and several other staff members. (Tr. 2/24/05 at 6.) Dr. Audett testified that the hospital's Vice President for Risk Management led all the interviews and encouraged the interviewees to provide an account of their perceptions. (Tr. 2/24/05 at 9.) Representatives of the hospital's anesthesia group also observed the interviews. (Tr. 2/24/05 at 8.)
Following these interviews, Dr. Audett and the other investigators met with the Appellant to obtain his side of the events. (Tr. 2/24/05 at 12.) The Appellant admitted to the group that he had given the patient a neck and shoulder massage and told them that he routinely provided massages to patients who had epidural anesthesia when delivering babies by Caesarian Section. (Tr. 2/24/05 at 12.) He implied to the interviewers that he could effectively extend the massage therapy to other surgical patients who received local anesthetics. (Tr. 2/24/05 at 13.) The Appellant told the group that in addition to the spinal anesthetic, he had administered other drugs to Patient A throughout the procedure, most notably Versed and Propofol. (Tr. 2/24/05 at 21.) In the meeting with the Appellant, one of his anesthesia group colleagues, Marc S. Andreani-Fabroni, M.D., stated that in his experience, Propofol could cause patients to think strange thoughts. (Tr. 2/24/05 at 24.) For example, a patient might awaken thinking that he had been chopping wood in the backyard. (Tr. 2/24/05 at 24.) According to Dr. Audett, the Appellant did not reply to his colleague's re marks. (Tr. 2/24/05 at 25.)
Following his interviews with the staff involved in Patient A's surgery and the Appellant, Dr. Audett met with Patient A and her family. (Tr. 2/24/05 at 28.) Dr Audett testified that he found Patient A "fully aware," communicative and intelligent. (Tr. 2/24/05 at 29-30.) He testified that Patient A described in detail that the Appellant had started massaging her neck and shoulders, then moved his hands down to fondle her breasts. (Tr. 2/24/05 at 31.) She told Dr. Audett that she was aware of the placement of the EKG leads and that she knew they had nothing to do with the Appellant touching her breasts. (Tr. 2/24/05 at 32.) Dr. Audett stated that Patient A seemed offended that he would suggest that she did not understand the difference between incidental touching due to placing the EKG leads and fondling her breasts. (Tr. 2/24/05 at 32.)
Dr. Audett also suggested to Patient A that the anesthesia drugs may have caused her to believe mistakenly that the Appellant had assaulted her. (Tr. 2/24/05 at 33-34.) He stated that his suggestion offended Patient A. (Tr. 2/24/05 at 34.) Finally, when Dr. Audett asked Patient A why she did not say anything when the Appellant was allegedly massaging her breast, she responded that she did not want to distract Dr. Humbyrd and adversely affect the outcome of the procedure. (Tr. 2/24/05 at 35-36.) Upon completion of his interview with Patient A, Dr. Audett concluded that her story was credible. (Tr. 2/24/05 at 37.) Administrative staff at the hospital then asked the Appellant to take an administrative leave from work at the hospital. (Tr. 2/24/05 at 37.) According to Dr. Audett, the Appellant agreed to the request. (Tr. 2/24/05 at 38.)
 Testimony of Susan Kelliher, R.N.
At the time of the alleged molestation, Nurse Kelliher worked at Kent County Hospital as a recovery room nurse for Patient A's surgical procedure. (Tr. 2/24/05 at 54-55.) Nurse Kelliher first saw Patient A when she arrived in the post-anesthesia care unit ("PACU") after her surgery at approximately 11:40 AM. (Tr. 2/24/05 at 55.) She testified that when Patient A first arrived in the recovery room, Patient A was awake, but still under the effects of the spinal anesthetic. (Tr. 2/24/05 at 71.) According to Nurse Kelliher, she and other nurses evaluated Patient A's condition approximately every fifteen minutes. At 1:30 PM, Patient A reported to Nurse Kelliher for the first time that someone at the top of the surgical table had inappropriately touched her during surgery while the surgical drape was raised and no one else could see the physical contact. (Tr. 2/24/05 at 77, 85.) Nurse Kelliher testified that she immediately notified the charge nurse about Patient A's allegation. (Tr. 2/24/05 at 77.) Both the charge nurse and Mark Patrick, M.D., the Chief of Anesthesiology at Kent County Hospital, then spoke with Patient A. (Tr. 2/24/05 at 80-81, 90.) Patient A reiterated her story to them and told them that the person who had touched her was the same person that had provided her anesthesia. (Tr. 2/24/05 at 85.) Patient A denied to Nurse Kelliher, Dr. Patrick, and the charge nurse that she had complained of neck pain or discomfort that would warrant a neck massage. (Tr. 2/24/05 at 90-91.) Patient A repeated that she did not cry out or alert anyone about the incident during the surgical procedure because she was afraid to disrupt the surgery. (Tr. 2/24/05 at 88-89.) She also stated that she felt "ashamed" and "embarrassed." (Tr. 2/24/05 at 88.) Patient A said that she believed that no one would believe her if she said anything. (Tr. 2/24/05 at 88.) According to Nurse Kelliher, Patient A was tearful, crying, and upset while recounting her story, and she developed blotches on her skin. (Tr. 2/24/05 at 92.)
 Testimony of Martha Galeota, R.N.
Nurse Galeota participated in the surgical procedure to a limited extent. She worked as the circulating nurse while the primary circulating nurse, Lee-Ann Falcone, R.N., was taking a coffee break. (Tr. 2/24/05 at 110-111.) Therefore, Nurse Galeota was present during the surgery for approximately fifteen minutes. (Tr. 2/24/05 at 111.) According to Nurse Galeota, a circulating nurse keeps an accurate record of a patient and his or her surgical procedure and assists the operating room nurse and surgeon as needed. (Tr. 2/24/05 at 109.) Nurse Galeota testified that when she came into the operating room, she received a report from the primary circulating nurse on duty. (Tr. 2/24/05 at 114.) She then began completing her paperwork on Patient A's progress an d on the surgical procedure. (Tr. 2/24/05 at 114.) Nurse Galeota stated that she observed the Appellant at the head of the surgical table with Patient A. (Tr. 2/24/05 at 114.) The Appellant sat very close to Patient A and leaned over the end of the table. (Tr. 2/24/05 at 114-115.) Nurse Galeota did not observe what the Appellant was doing or hear whether he said anything to Patient A. (Tr. 3/2/05 at 82.)
However, Nurse Galeota testified that the Appellant was hovering close to the patient in an "intimate" manner. (Tr. 3/2/05 at 82.) She testified that the Appellant was leaning over the patient with his arms on the table, but the surgical screen prevented her from seeing his hands. (Tr. 3/2/05 at 82.) Nurse Galeota then went to the foot of the table to assist the surgical team. (Tr. 3/2/05 at 83.) She observed that the Appellant sat next to the head of the table while she was in the operating room. (Tr. 3/2/05 at 84.) Nurse Galeota did not hear any conversation that may have taken place between Patient A and the Appellant. (Tr. 3/2/05 at 87-88.) However, she testified that the Appellant's head was very close to Patient A as if they were conversing. (Tr. 3/2/05 at 88.)
 Testimony of Mark Patrick, M.D.
Dr. Patrick is the Managing Partner of the anesthesia group working at Kent County Hospital.[5] (Tr. 3/2/05 at 10.) On the afternoon of December 23, 2004, a nurse from the PACU advised him in general terms about Patient A's complaint. (Tr. 3/2/05 at 17-18.) Dr. Patrick immediately went to see her. When he arrived at the PACU, Patient A was "sobbing." (Tr. 3/2/05 at 18.) She told him that the man that sat at the head of the operating room table and gave her anesthesia had "rubbed" her breasts. (Tr. 3/2/05 at 18.) According to Dr. Patrick, Patient A stated that she had tried to "put it out of [her] mind." (Tr. 3/2/05 at 18.) Failing that, she decided to speak to someone about the incident. She said the man kept asking her if she had a boyfriend. (Tr. 3/2/05 at 18.) He also told her that he could not control himself and asked her not to tell anyone. (Tr. 3/2/05 at 18.) Patient A told Dr. Patrick that she was afraid to tell anyone during the incident for fear that the surgeon would injure her knee. (Tr. 3/2/05 at 20.) Dr. Patrick testified that while he was talking to Patient A, the Appellant entered the PACU with another patient. (Tr. 3/2/05 at 20.) As soon as the Appellant started speaking, Patient A said to Dr. Patrick, "That's him, that's the voice. I'll never forget it." (Tr. 3/2/05 at 20.)
With regard to the drug regimen given to Patient A, Dr. Patrick stated that he examined her record, which provided the basis for his testimony. (Tr. 3/2/05 at 20.) He noted that she received a spinal anesthetic — a localized anes thetic — rather than general anesthesia. (Tr. 3/2/05 at 27-28.) While waiting in the holding area prior to her surgery, Patient A received a 2mg dose of Versed. (Tr. 3/2/05 at 35.) Once in the surgical suite, the Appellant administered a spinal with 1% Tetracine, which would render Patient A numb and unable to move below her waist. During the operation, Patient A received three more doses of 2mg of Versed, which the Appellant injected at three distinct times during the operation. (Tr. 3/2/05 at 65.) Dr. Patrick explained that Versed is an anti-anxiety medication that reduces stress and induces amnesia. (Tr. 3/2/05 at 66.) Patient A also received two doses of 50mg of Propofol, the first at 9:15AM and the second at 9:50AM. (Tr. 3/2/05 at 67.)
Dr. Patrick also testified about the placement of the EKG leads and electrodes on Patient A's body. Though Patient A's record did not indicate the number of leads, Dr. Patrick stated that five would be a typical number, but could vary depending on the doctor's medical judgment. (Tr. 3/2/05 at 38, 71.) Dr. Patrick testified that an anesthesia provider would place leads near a patient's brea sts, but never on them. (Tr. 3/2/05 at 40.)
 Testimony of Danny E. Humbyrd, M.D.
Dr. Humbyrd operated on Patient A's knee. (Tr. 4/8/05 at 11.) He testified generally about what transpired during the surgery, including the configuration of equipment in the operating room. (Tr. 4/8/05 at 13-20.) However, Dr. Humbyrd could not offer any evidence that supported or disputed Patient A's allegations of unwarranted touching because he was on the opposite side of the surgical drape and could not see the patient's upper body. However, Dr. Humbyrd did state that he could hear some limited conversation between the Appellant and Patient A, including some questioning regarding whether Patient A was feeling stiffness in her neck. (Tr. 4/8/05 at 25.) He recalled that Patient A responded affirmatively. (Tr. 4/8/05 at 26.) Dr. Humbyrd further testified that he thought that the Appellant's conversation was too friendly and that the questions he posed to Patient A would be more appropriate coming from a person closer in age to her. (Tr. 4/8/05 at 26-27.) Dr. Humbyrd stated that he did not pay particular attention to the details of the conversation, but he felt that the Appellant may have been trying to allay any fears that Patient A had about undergoing surgery. (Tr. 4/8/05 at 26.)
When asked to describe the operating room, Dr. Humbyrd testified that a door with a window connected the surgical suite to a hallway. (Tr. 4/8/05 at 33.) The door was located directly behind the head of the surgical table where the Appellant sat close to Patient A's upper body. (Tr. 4/ 8/05 at 33.) Anyone passing by the window could look into the room. (Tr. 4/8/05 at 34.) However, Dr. Humbyrd stated that the Appellant and Patient A might not have been in plain view of anyone looking through the window. (Tr. 4/8/05 at 34.) He stated that the anesthesia apparatus is a large piece of equipment that extends toward the head of the table, thereby potentially obstructing the view of the Appellant and Patient A from the door. (Tr. 4/8/05 at 34.) Dr. Humbyrd noted that people do come through the door during surgery, since neither he nor the Appellant controlled access to the room. (Tr. 4/8/05 at 44.)
 Testimony of Patient B
A woman ("Patient B") testified that the Appellant provided her with anesthesia during a surgical procedure in August 2000 at Wing Memorial Hospital in Palmer, Massachusetts. (Tr. 5/2/05 at 16.) Although the Administrative Decision asserted that Patient B contacted the Board after reading about the Appellant's Summary Suspension (Administrative Decision at 12, n. 7), Patient B testified that she became aware of the Appellant's alleged incident with Patient A when a doctor from Wing Memorial Hospital contacted her. (Tr. 5/2/05 at 36.)
At the time of her surgery, Patient B was twenty-three years old and a single mother. (Tr. 5/2/05 at 15-16.) She went to the hospital for the surgical removal of a cyst on her left wrist. (Tr. 5/2/05 at 17.) Patient B testified that during her surgery, her upper body was on one side of a surgical drape. (Tr. 5/2/05 at 18-19.) The surgical drape rose vertically to obstruct her view of the surgical team on the other side of the screen. (Tr. 5/2/05 at 19.) Her left arm was extended through an opening in the drape so that the surgeon could operate on her while on the drape's sterile side. (Tr. 5/2/05 at 19.) The Appellant remained with Patient B at the head of the table on the non-sterile side of the drape. Patient B stated that the Appellant sedated her and that she fell asleep for about fifteen or twenty minutes. (Tr. 5/2/05 at 20.) When she awakened, the Appellant began a conversation with her. (Tr. 5/2/05 at 20.) He asked about her marital status and whether she had any children. (Tr. 5/2/05 at 21.) According to Patient B, the Appellant commented on a small tattoo that she had on her neck. (Tr. 5/2/05 at 21.) He asked her if she had any others, and she responded that she had one on her stomach. (Tr. 5/2/05 at 21.) The Appellant asked her if he could see the tattoo, and she gave him her permission. (Tr. 5/2/05 at 21.) Instead of looking at the tattoo, the Appellant placed both of his hands on her chest and began massaging and squeezing her breasts. (Tr. 5/2/05 at 21.) The Appellant then asked if he could play with her breasts, but Patient B immediately refused. (Tr. 5/2/05 at 22.) Patient B testified that the Appellant then leaned closer to her and whispered into her right ear, "Don't tell anybody because I can get in a lot of trouble." (Tr. 5/2/05 at 22.) According to Patient B, she did not tell anyone because she felt afraid and wanted to leave the hospital quickly. (Tr. 5/2/05 at 23.)
After the operation, Patient B's grandmothe r came to the hospital to find out how Patient B was doing. (Tr. 5/2/05 at 23.) Once her grandmother arrived, Patient B told her what the Appellant had done to her. (Tr. 5/2/05 at 23.) Patient B testified that she reported the incident to the Palmer Police Department later that same day. (Tr. 5/2/05 at 24; State's Exhibit 12.) Patient B also di scussed the incident with Wing Memorial Hospital. (Tr. 5/2/05 at 26.) According to Patient B, the hospital's medical director interviewed her first, followed by a six-person investigatory team from the University of Massachusetts Medical Center.[6] (Tr. 5/2/05 at 27-30.) Patient B testified that she was not satisfied with the investigation because the team kept focusing on whether the assault she described actually occurred. (Tr. 5/2/05 at 31.) According to Patient B, the investigators for the hospital did not appear to believe her. (Tr. 5/2/05 at 31.) Patient B further testified that she wanted the police to press charges against the Appellant. (Tr. 5/2/05 at 33.) However, the police concluded their investigation without charging the Appellant. (Tr. 5/2/05 at 34.) Likewise, the hospital seemingly took no action against him. (Tr. 5/2/05 at 36.) Patient B did not initiate any legal action against the Appellant or attempt to obtain any money from him. (Tr. 5/2/05 at 32.) Patient B testified that she reported the alleged assault to the police and hospital authorities because she "didn't want to be a victim." (Tr. 5/2/05 at 46.)
 Testimony of Karin Stitsinger, R.N.
The Appellant called on Nurse Stitsinger to refute Patient B's testimony. Nurse Stitsinger served as the circulating nurse during Patient B's surgery at Wing Memorial Hospital. (Tr. 5/6/05 at 86-88, 94.) She adamantly stated that, as the circulating nurse, she could view Patient B and the Appellant at all times during the procedure. (Tr. 7/20/05 at 38.) Nurse Stitsinger claimed that she did not observe any untoward activity on the part of the Appellant toward Patient B. (Tr. 5/6/05 at 90.) She stood by this claim throughout Wing Memorial Hospital's investigation into Pa tient B's complaint. (Tr. 5/6/05 at 92-93.)
However, Nurse Stitsinger did note that she had a number of duties to perform as circulating nurse during the forty-minute surgery, including controlling Patient B's tourniquet, taking notes on the procedure, and walking around the room to watch the surgery. (Tr. 7/20/05 at 10-12, 21-22.) Additionally, Nurse Stitsinger testified that she was friendly with the Appellant and that he once had provided her with anesthesia during a surgical procedure. (Tr. 7/20/05 at 92.) She noted that they had communicated several times since he left the employ of Wing Memorial Hospital — once when she sought a reference from him and at other times "just to gossip." (Tr. 7/20/05 at 37-38.)
 Testimony of Michael J. Infantolino, M.D.
Dr. Infantolino participated in Patient A's surgery as the first assistant to Dr. Humbyrd. (Tr. 8/12/05 at 7.) During the surgery, Dr. Infantolino sat on Patient A's left side, near her hip and on the sterile side of the surgical screen. (Tr. 8/12/05 at 7-8.) Dr. Infantolino testified that as surgeons, he and Dr. Humbyrd concentrate their attention on the surgical area — in this case, Patient A's knee — but they note all of a patient's activities. (Tr. 8/12/05 at 10-11, 37-38.) From where Dr. Infantolino was sitting, he could wheel his stool out of the sterile field and look at Patient A and the Appellant at any time. (Tr. 8/12/05 at 23-24.) Dr. Infantolino indicated that he neither saw nor heard anything unusual during the operation. (Tr. 8/12/05 at 12.) Dr. Infantolino testified that he cannot specifically recall whether he arrived in the operating room at the outset of the surgery or shortly thereafter. (Tr. 8/12/05 at 33-34.)
Dr. Infantolino also testified that both Propofol and Versed are commonly used medications in surgeries. (Tr. 8/12/05 at 7.) When asked his opinion on the allegations against the Appellant, Dr. Infantolino stated that "it's mind-boggling" to believe that the Appellant could have assaulted Patient A in a room full of people. (Tr. 8/12/05 at 45.)
 Testimony of Lee-Ann Falcone, R.N.
Lee-Ann Falcone, R.N., served as the primary circulating nurse during Patient A's surgery. (Tr. 8/12/05 at 50.) Nurse Falcone testified that during the surgery, she had the responsibility of taking care of Patient A, assisting with the anesthesia, providing sterile equipment as needed, and keeping notes. (Tr. 8/12/05 at 50-51.) She estimated that she spent about fifteen percent of her time to Patient's A's right side, about six feet away from the Appellant on the non-sterile side of the surgical drape. (Tr. 8/12/05 at 52.) During the remaining eighty-five percent of the surgery, she was moving about the room performing her duties. (Tr. 8/12/05 at 52.) She testified that she did not specifically hear or see the Appellant say or do anything inappropriate to Patient A. (Tr. 8/12/05 at 52-53.)
On cross-examination, Nurse Falcone described the surgical drape as being about six feet wide across the patient's upper body. (Tr. 8/12/05 at 57.) The drape covered Patient A's arms, but not her chest. The drape rises vertically above the patient's body to a height of approximately two feet. (Tr. 8/12/05 at 62.) Patient A's head, while lying on the operating room table, rested about four feet above the floor, so the surgical screen rises to a total height of about six feet from the floor. (Tr. 8/12/05 at 62.) Nurse Falcone testified that an anesthesia provider usually sits behind a patient's head, such that other people typically cannot see him or her from the sterile side of the drape. (Tr. 8/12/05 at 62-63.) During a surgical procedure, the surgeons normally cannot see the anesthesia provider, nor can the anesthesia provider see the surgeons. (Tr. 8/12/05 at 63.)
 Testimony of the Appellant
The State initially called on the Appellant to testify as an adverse witness. During this hearing session, the Appellant provided only general background information and refused to testify about Patient A's allega tions, invoking his Fifth Amendment rights in light of an ongoing criminal investigation by the Office of the Attorney General of Rhode Island. (See generally Tr. 2/18/05 at 10-64.)
However, the Appellant later provided extensive testimony in his defense concerning Patient A's allegations. He claims he first heard of the complaint later in the same day as the surgery, when he met with Drs. Audett, Patrick, and Andreani-Fabroni and with the hospital's Vice President of Ri sk Management. (Tr. 7/26/05 at 12-13.) The Appellant testified that he did not recall what explanation he gave during this meeting, but he did remember giving Patient A "neck traction," a term he uses interchangeably with "neck massage." (Tr. 5/4/05 at 79-80; Tr. 7/26/05 at 23-25, 44-45.) He denied ever fondling Patient A's breasts. (Tr. 5/4/05 at 96.) The Appellant stated that when he applied neck traction to Patient A, his hands never went under the surgical drape. (Tr. 7/26/05 at 45.) In response to Nurse Galeota's testim ony that she could not see his hands, the Appellant testified that he may have placed his hands under Patient A's head or behind her pillow. (Tr. 7/26/05 at 48.) The Appellant also disputed Nurse Falcone's testimony that the sterile drape rose two feet above Patient A's chest at a ninety degree angle. (Tr. 8/12/05 at 76.) In his testimony, he initially described the sterile drape as rising at a right angle, but he later asserted instead that the angle was less severe, allowing him to see over the drape. (Compare Tr. 7/26/05 at 42 with Tr. 8/12/05 at 76.)
With regard to Patient B's allegations ar ising from her surgery at Wing Memorial Hospital, the Appellant denied any wrongdoing. (Tr. 5/4/05 at 102.) He could not recall specifically the medications he administered to her, but he thought he probably used Versed and Propofol. (Tr. 7/20/05 at 61.) He recalled that hospital administrators interviewed him about the incident, but took no further action. (Tr. 5/4/05 at 97-98.)
With respect to medications, the Appellant testified that he is a "minimalist," meaning that he does not administer more medication than required. (Tr. 7/26/05 at 36.) In Patient A's surgery, the Appellant claims to have administered four separate doses of 2mg of Versed — one preoperative dose and the other three during the course of the procedure. (Tr. 5/4/05 at 93, 95; State's Exhibit 4) Over the course of the surgical procedure, the Appellant administered two doses of Propofol at 50mg and, at the end of the surgery, Benadryl for Patient A's alleged itching. (State's Exhibit 4.)
 Expert Testimony of Kathleen Hittner, M.D.[7]
In establishing her expertise for the Hearing Committee, Dr. Hittner testified that she worked as a full-time anesthesiologist at Miriam Hospital in Providence, Rhode Island from 1979 until 2000, when she assumed the presidency of the hospital. (Tr. 5/4/05 at 6.) Dr. Hittner also serves as a diplomat of the American Board of Anesthesiologists. (Tr. 5/4/05 at 5.) She testified that despite her position as a hospital president, she practices anesthesia at least one full day per week and more if Miriam Hospital's anesthesia department requires a dditional support. (Tr. 5/4/05 at 6-7.) Dr. Hittner is also a full Clinical Professor of Anesthesia at Brown University School of Medicine. (Tr. 5/4/05 at 7.)
Dr. Hittner testified that she is very familiar with the drugs Versed and Propofol. (Tr. 5/4/05 at 8.) She stated that in her capacity as Chief of Anesthesia at Miriam Hospital, she initiated the use of Propofol at the hospital and has administered the drug in "thousands and thousands" of cases in various operating room settings. (Tr. 5/4/05 at 9, 12.) She further testified that she has used Propofol in "every dose that is required for sedation of a patient." (Tr. 5/4/05 at 14.)
In support of his case, the Appellant placed into evidence several published articles of case studies involving the administration of Propofol and associated patient fantasies, specifically those of a sexual nature. Dr. Hittner commented on the articles based on her own experience as an anesthesiologist and as the supervising chief of a group of anesthesia providers. (Tr. 5/4/05 at 15.) Dr. Hittner testified that despite thousands of cases in which she administered Propofol, she experienced only two instances in which she could recall anything of a sexual nature occurring. (Tr. 5/4/05 at 15.) In one instance, a male patient "pinched" her backside, while in the other case, a female patient reached out to touch her. (Tr. 5/4/05 at 15.) Dr. Hittner stated she has neither observed nor received any reports of similar cases. (Tr. 5/4/05 at 16.) Furthermore, the two instances that she could recall occurred when anesthesia providers were just beginning to use Propofol. (Tr. 5/4/05 at 16.) As anesthesia providers learned more about Propofol, they became more proficient at administering the drug. (Tr. 5/4/05 at 16.) According to Dr. Hittner, anesthesia providers commonly sedate patients using Propofol in combination with other drugs such as Versed. (Tr. 5/4/05 at 16.)
Dr. Hittner then testified that in preparation for her testimony, she had consulted the Physician's Desk Reference concerning the use and effects of Propofol. (Tr. 5/4/05 at 17.) She stated that the Physician's Desk Reference notes that sexual fantasies in conjunction with the use of Propofol occurred in less than 1% of patients.[8] (Tr. 5/4/05 at 17.) Dr. Hittner further stated that she could not find any documented and controlled experiments regarding sexual fantasies resulting from the use of Propofol. (Tr. 5/4/05 at 16-17.) She asserted that the medical literature on this subject is not scientific, but is instead composed of reported case studies. (Tr. 5/4/05 at 21, 57.) Each case study describes one of two specific types of patient fantasies. In the first type, the patient reaches out either verbally or physically to medical personnel as "an object of their sexual attention or desire." (Tr. 5/4/05 at 22.) In the second type, a patient feels as if someone has sexually assaulted him or her. (Tr. 5/4/05 at 22.) According to Dr. Hittner, the case studies reveal that incidences of these fantasies occur in cases wherein a surgical procedure involves parts of the body normally identified with sexual acts. (Tr. 5/4/05 at 22.) Dr. Hittner gave examples of an endoscopy[9] during which the patient fantasized that she had oral sex and a surgery involving the placement of vaginal sponges wherein the patient fantasized that she had sexual intercourse. (Tr. 5/4/05 at 22-23.) Dr. Hittner stated that the introduction of the use of Versed in conjunction with Propofol has reduced the tendency of patients to "act out." (Tr. 5/4/05 at 23.)
On cross-examination by the Appellant's counsel, Dr. Hittner pointed out that the medical literature suggests that reports of the hallucinogenic properties of Propofol often disguise incidents of patient abuse. (Tr. 5/4/05 at 46.) Furthermore, she noted that the case studies specifically state not to use them in defense of criminal charges of sexual abuse.
Dr. Hittner compared the reported cases to the incident reported by Patient A. Dr. Hittner stated that to a reasonable degree of medical certainty she could differentiate the case studies from Patient A's allegations ag ainst the Appellant. (Tr. 5/4/05 at 26.) In these cases, the sexual fantasy comes from the release of a patient's own inhibitions that causes the patient to act out or to make statements that a person would not otherwise state. (Tr. 5/4/05 at 26-27.) However, in the instant case, Patient A reported that the Appellant initiated a conversation with her and asked about her boyfriend. (Tr. 5/4/05 at 26.) The Appellant then progressed to massaging her neck, fondling her breasts, and finally telling her not to say anything about the occurrence. (Tr. 5/4/05 at 26.) Dr. Hittner testified that Patient A's allegations do not fit any of the reported case studies. (Tr. 5/4/05 at 27.) Although Dr. Hittner found the neck massage "unusual," Patient A seemed to accept the Appellant's offer to provide her w ith the massage. (Tr. 5/4/05 at 30.) Given that Patient A understood and agreed to the massage, Dr. Hittner had difficulty believing that the patient then imagined the physical touching and the Appellant's admonition that she not tell anyone. (Tr. 5/4/05 at 30.)
In reviewing Patient A's record of medications, Dr. Hittner testified that she did not find a problem with two doses of 50mg of Propofol. (Tr. 5/4/05 at 30, 32.) However, she stated that she would have used less than the four doses of Versed that the Appellant administered to Patient A. (Tr. 5/4/05 at 33-34.) The doctor opined that in light of the Propofol and the spinal anesthetic that the Appellant administered, the Appellant used an excessive amount of Versed. (Tr. 5/4/05 at 34.) Additionally, Dr. Hittner considered the administration of Benadryl near the end of the operation to be unusual. (Tr. 5/4/05 at 32.) She stated that based on Patient A's record an d the anesthesia record, the initial dose of Versed in tandem with two administrations of Propofol should have proven sufficient for the procedure. (Tr. 5/4/05 at 34-35.)
In response to Patient A's statement that she fell asleep after the Appellant fondled her breasts and admonished her not to tell anyone, Dr. Hittner opined that the Appellant administered the additional doses of Versed to cause the patient to sleep and forget that the incident occurred. (Tr. 5/4/05 at 35.) According to Dr. Hittner, administering Benadryl furthered this purpose.
Dr. Hittner also testified about the physical aspects of the operating room and the location of people therein. She stated that in the instant case, the surgeons would have conducted the procedure on the sterile side of the surgical drape outside the view of Patient A. (Tr. 5/4/05 at 37.) The Appellant would have had access to Patient A's body from her head to almost her waist area and could reach under her patient drape.[10] (Tr. 5/4/05 at 38.)
On cross-examination, the doctor stated that she did not believe that the removal of the EKG leads could serve as stimuli that would provoke a sexual fantasy, because standards in the practice dictate placing the electrodes above the breast area, higher on a patient's chest. (Tr. 5/4/05 at 53.) Dr. Hittner also noted that the Appellant charted itching and administrated Benadryl. She stated that she felt skeptical about Patient A's alleged itching. (Tr. 5/4/05 at 68.) The operating room nurse did not chart the itching, nor did anyone report it in the PACU. Patient A's itching appears only on the Appellant's anesthesia chart. (Tr. 5/4/05 at 68.) Dr. Hittner reiterated her opinion that the Appellant administered the Benadryl in combination with the other medications to make Patient A sleep and forget what happened to her. (Tr. 5/4/05 at 69.) However, she also acknowledged that Benadryl is a common method for treating itchiness in surgical patients. (Tr. 5/4/05 at 68-70.)
 Expert Testimony of Edward A. Kent, M.D.
Dr. Kent is a board-certified anesthesiologist. At the time of his testimony, Dr. Kent practiced anesthesia at South County Hospital in Wakefield, Rhode Island. (Tr. 5/6/05 at 5.) He formerly served as Chief of the Department of Anesthesiology at South County Hospital and President of the Rhode Island Society of Anesthesiologists. (Tr. 5/6/05 at 7.) Dr. Kent noted that anesthesia providers on occasion provide neck traction or massage to alleviate patient discomfort. (Tr. 5/6/05 at 31-33) He also stated that the amount of medication that the Appellant provided to Patient A falls within normal standards of care. (Tr. 5/6/05 at 27.) Dr. Kent did not believe that an incident like that alleged by Patient A would likely occur in an operating room setting. (Tr. 5/6/05 at 56.)
With regard to the medical literature on patient sexual fantasies due to Propofol sedation, Dr. Kent co-authored an article citing cases of patients making physical advances to their anesthesia provider or asking very personal questions. (See Respondent's Exhibit B.) He asserted that the medical literature must rely on anecdotal evidence and case studies, because conducting controlled studies into Propofol-induced sexual fantasies would not be feasible. (Tr. 5/6/05 at 10.) He also testified that he has personally observed patients speak and act amorously or otherwise inappropriately while sedated by Propofol. (Tr. 5/6/05 at 9-10.)
However, Dr. Kent could not provide statistical evidence on the frequency of Propofol-induced sexual hallucinations. (Tr. 5/6/05 at 18.) He also acknowledged that the relevant medical literature indicates that doctors have used the amnesiac effects of Versed to sexually assault their victims. (Tr. 5/6/05 at 54.)
 Expert Testimony of Marc S. Andreani-Fabroni, M.D.
Dr. Andreani currently works as the Chief of Anesthesia at Kent County Hospital and has served on the board of the Rhode Island Society of Anesthesiologists. (Tr. 7/20/05 at 41.) He has experience using Benadryl, Propofol, and Versed during surgeries, and he testified that the Appellant's dosages fell within reasonable standard use of the drugs. (Tr. 7/20/05 at 49-51.) Moreover, Dr. Andreani considered the dosage of Propofol administered to Patient A as "probably actually on the low side." (Tr. 7/20/05 at 51.) He recalled witnessing two instances of hallucinations by patients administered Propofol, but noted that these events occurred approximately twelve or thirteen years ago. (Tr. 7/20/05 at 53-54.) He also acknowledged the lack of controlled studies on the link between Propofol and patients' sexual fantasies, but he believed that incidents of "hallucinations, euphoria, dreams, etc." occurred in less than one percent of cases. (Tr. 7/20/05 at 56.)
 Expert Testimony of William Dodd, C.R.N.A.[11]
Mr. Dodd has practiced as a nurse anesthetist for thirty years and currently serves on the Rhode Island Board of Nursing. (Tr. 7/26/05 at 4-5.) He testified that he has used Propofol in his cases on a regular basis for approximately the last twenty years. (Tr. 7/26/05 at 5-6.) Mr. Dodd reported that in 2005, he participated in a surgery on a female patient involving the administration of general anesthesia and an air mask. (Tr. 7/26/05 at 7.) He testified that when he removed the airway mask, the patient exclaimed, "God, that was the best sex I ever had." (Tr. 7/26/05 at 7.) Mr. Dodd further testified that the Appellant administered dosages of medications within standard operating procedure in Patient A's surgery. (Tr. 7/26/ 05 at 9-10.) On cross-examination, Mr. Dodd testified that he was not engaged in an ongoing conversation with the surgical patient when she made her remark. (Tr. 7/26/05 at 11.)
 Expert Testimony of Frederick W. Burgess, M.D., Ph.D.
Dr. Burgess is a medical doctor and is board-certified in anesthesia. (Tr. 8/17/05 at 4-5.) He also has a bachelor's degree in pharmacy and a doctorate in biochemical pharmacology. (Tr. 8/17/05 at 4.) He testified that he examined the anesthesia record of Patient A's surgery and stated that he was familiar with Versed, noting that the drug came into popular use around 1986. (Tr. 8/17/05 at 5, 6.) Dr. Burgess is also familiar with the use of Propofol, which became popularly used in the early 1990s. (Tr. 8/17/05 at 4, 6.) He stated that he assists in operations similar to Patient A's proce dure on a monthly basis. (Tr. 8/17/05 at 5.) Moreover, Dr. Burgess has utilized Versed and Propofol on a daily basis. (Tr. 8/17/05 at 7.) Dr. Burgess testified that the combined use of Versed and Propofol is a common practice among anesthesia providers. (Tr. 8/17/05 at 16.) He explained that anesthetists use Versed to "put the patient out" and to diminish pain, while they administer Propofol to make the patient wake up with less of a "hangover." (Tr. 8/17/05 at 16.) The doctor further testified that itchiness is often associated with the use of narcotics and that anesthesia providers usually administer Benadryl to treat the itchiness. (Tr. 8/17/05 at 17-18.)
Dr. Burgess testified that conversation between an anesthesia provider and a patient is not unusual. (Tr. 8/17/05 at 19.) In fact, he preferred conversation to silence, because conversing helps place the patient at ease and distracts the patient from any pain. (Tr. 8/17/05 at 19-20.) Dr. Burgess also stated that the use of neck massage or neck traction can also aid the anesthesia provider in keeping the patient comfortable. (Tr. 8/17/05 at 22.) He explained that patients who receive spinal blocks that create numbness and prevent movement can become stiff and uncomfortable. (Tr. 8/17/05 at 22.) However, he acknowledged that nothing in Patient A's chart indi cated that she was experiencing any neck discomfort. (Tr. 8/17/05 at 60-61.)
Dr. Burgess also commented on the anesthesia articles that the Appellant's counsel had introduced into evidence. He testified that the literature suggests that patients who receive lighter drug dosages are more likely to dream, and that with the use of Propofol, rapid recovery from the effects of the anesthetic might permit verbal communication before the patient had forgotten the dream. (Tr. 8/17/05 at 23-26.)
On cross-examination, Dr. Burgess acknowledged that absent a complaint of pain from the patient, he would not introduce neck traction or massage. (Tr. 8/17/05 at 56.) However, he noted that other anesthesia providers might use neck traction or massage without first hearing a patient complain about pain or discomfort. (Tr. 8/17/05 at 55-56.)
 The Hearing Committee's Conclusions
The Hearing Committee considered Patient A's testimony both credible and compelling. The Committee noted that she testified about the incident in significant detail, including her conversations with the Appellant and the alleged sexual assault. The conversation included discussions of Patient A's boyfriend and her Christmas shopping. The Hearing Committee determined that Patient A did not express any discomfort of her neck or shoulders, but she did acquiesce to the Appellant's suggestion that he give her a massage. He then proceeded to fondle or rub her breasts and asked her not to tell anyone about the incident.
The patient said she then fell asleep and did not awaken until after the surgery. In addition to the patient's testimony, the H earing Committee considered Dr. Hittner's observations noteworthy and accepted her as an expert witness in the field of anesthesiology. Dr. Hittner testified that although the Appellant utilized limited dosages of Versed and Propofol to sedate the patient, she opined that the amounts used in combination were excessive. In her opinion, the initial administration of Versed, followed by two doses of Propofol, was sufficient to numb the patient and mask any pain.
The Hearing Committee concurred with Dr. Hittner in finding that the addition of more Versed would bring on sleep and possibly cause Patient A to think that she had not remained awake during the procedure. Moreover, the Committee agreed with Dr. Hittner that Benadryl would contribute to Patient A' s sleep following the alleged molestation and amnesia upon waking. The Committee Members also considered significant the fact that the nurse's notes made no mention of Patient A's supposed itchiness which the Appellant claims necessitated the administration of Benadryl. In light of Dr. Hittner's testimony, the Hearing Committee readily agreed that the Appellant deliberately chose to administer Versed, Propofol, and Benadryl to induce Patient A to forget that the incident ever happened.
The Hearing Committee also noted the fact that the Appellant admitted to having a conversation with the patient and to giving her a neck message. In light of Dr. Hittner's testimony, the Hearing Committee questioned why the patient would be so clear on that part of her recollection, but not on the Appellant's actions that followed. In effect, the Appellant was asserting that the Hearing Committee should lend its credence to one half of Patient A's testimony, but not the other half. The Hearing Committee did not accept this line of reasoning.
The Hearing Committee also considered Patient B's testimony to be credible. The Committee noted that the Appellant's actions and statements during Patient B's surgery mirrored the allegations of Patient A, down to the exact actions and words used by the Appellant. For example, the Appellant also engaged Patient B in a conversation about her personal life. After observing that Patient B had a tattoo and finding out that she had a second tattoo on her stomach, the Appellant asked to see it. When Patient B acquiesced, the Appellant took the opportunity to move his hands down to her breasts and begin squeezing them. He asked her if he could play with them, but she refused. He leaned close to her ear and told her that he could not help himself. As in the case of Patient A, he told Patient B that he would get in trouble if she told anyone about the incident. Because Patient A and Patient B did not know each other and lived in different states, the Hearing Committee determined that "the circumstances dictate against coincidence." (Administrative Decision at 28.)
The Hearing Committee further noted that Nurse Falcone, the circulating nurse at Kent County Hospital, testified that she spent only fifteen percent of her time during Patient A's surgical procedure seeing to Patient A, while she used the remaining eighty-five percent to attend to other duties in the room. In contrast, Nurse Stitsinger, the circulating nurse at Wing Memorial Hospital, testified that she did not leave the Appellant's side during Patient B's surgery. The Hearing Committee did not accept Nurse Stitsinger's testimony as credible, considering that circulating nurses have a duty to move about the operating room while performing various functions on both the sterile and non-sterile sides of the surgical drape.
Of the many witnesses who provided factual testimony about Patient A's surgery, only the Appellant stated that from his position at the head of the surgical table he could observe persons on the sterile side of the drape. The Hearing Committee noted that Dr. Infantolino's testimony was unclear regardingwhether he claimed that he could see over the sterile drape while he was seated assisting in the surgery or that he could see beyond the screen only if he wheeled his chair to the right into the non-sterile side of the drape. Regardless, Dr. Humbyrd clearly testified that he could not see over the sterile drape while seated on the opposite side. Thus, the Hearing Committee did not accept as true that a physician seated and performing surgery on the sterile side of the drape could simultaneously see over the drape to the head of the table.
The Hearing Committee duly read and considered the case studies and articles presented by the Appellant. The Committee held that this evidence did not represent controlled experiments. Furthermore, the articles and studies include cautionary language advising that a defendant not use them as evidence in sexual molestation cases. Some of the material also acknowledged that reported cases have been used to conceal patient abuse. Therefore, the Hearing Committee attributed minimal weight to the case studies and articles detailed, especially when measured against the testimony given by Patient A and Patient B in this case.
After considering the testimony and other evidence in the record, the Hearing Committee held that the Appellant committed unprofessional conduct by sexually molesting a female patient in his care in violation of G.L. 1956 § 5-37-5.1, both in general and specifically subsections (7), (19), and (30) thereof. In the Hearing Committee's Administrative Decision of December 8, 2005, the members unanimously voted to revoke the Appellant's license to practice medicine. All three members certified that they read the transcript, reviewed the evidence, and gave their assent to the Administrative Decision. (Hearing Committee's Certificat ion.) The Hearing Officer signed the Revocation Order, and the Rhode Island Director of Health assented to the Order as to form and substance. On December 27, 2005, the Appellant timely filed the instant appeal pursuant to the Administrative Procedures Act, G.L. 1956 §42-35-15. Thereafter, on April 11, 2006, a jury found the Appellant not guilty of sexual assault in a criminal trial arising out of the same events as the matter here on appeal.
 STANDARD OF REVIEW
The Superior Court of Rhode Island reviews contested agency decisions pursuant to the provisions of the Rhode Island Administrative Procedures Act, G.L. 1956 § 42-35-15(g). Section 42-35-15(g) provides that:
 [t]he court shall not substitute its judgment for that of the agency as to the weight of the evidence on the questions of fact. The court may affirm a decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In access of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in light of reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
In reviewing an agency decision, this Court will not weigh the evidence upon which findings of fact are based, but will limit itself to an examination of the certified record in deciding whether the agency had substantial evidence to support its decision. Ctr. for BehavioralHealth, Rhode Island, Inc. v. Barros, 710 A.2d 680, 684 (R.I. 1998). The Rhode Island Supreme Court has defined "substantial evidence" as "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, and means an amount more than a scintilla but less than a preponderance." Newport Shipyard, Inc. v. R.I. Comm'n for HumanRights, 673 A.2d 457, 459 (R.I. 1996). Moreover, this Court will not substitute its judgment for that of an agency as to the weight of the evidence on questions of fact, even if this Court "might be inclined to view the evidence differently and draw inferences different from those of the agency." Johnston Ambulatory Surgical Assocs. v. Nolan,755 A.2d 799, 805 (R.I. 2000) (quoting Rhode Island Pub. Telecomm. Auth. v. RhodeIsland State Labor Relations Bd., 650 A.2d 479, 485 (R.I. 1994)). When findings of fact are the product of a two-tiered agency review, the body of law elevates the fact-finder's role when credibility is in issue.Envtl. Scientific Corp. v. Durfee, 621 A.2d 200, 209 (R.I. 1993). Therefore, this Court may reverse findings of fact only where the factual conclusions of an administrative agency are "totally devoid of competent evidentiary support in the record," Baker v. Dep't ofEmployment and Training Bd. Of Review, 637 A.2d 360, 363 (R.I. 1994) (quoting Milardo v. Coastal Res. Mgmt. Council, 434 A.2d 266, 272 (R.I. 1981)). However, this Court may freely conduct de novo review of determinations of law made by the agency. Arnold v. R.I. DOL TrainingBd. of Review, 822 A.2d 164, 167 (R.I. 2003) (citing Johnston AmbulatorySurgical Assocs., Ltd. v. Nolan, 755 A.2d 799, 805 (R.I. 2000)).
 DISCUSSION I Constitutionality of G.L. 1956 § 5-37-5.2(e)(3)
The Appellant has attacked the constitutionality of G.L. 1956 §5-37-5.2(e)(3) based on the fact that this statute does not require the members of a hearing committee to observe personally all testimony during a hearing to determine whether a medical professional has engaged in unprofessional conduct. The Appellant alleges that the statute violates his right to due process of law, because Hearing Committee members charged with making credibility determinations can only duly evaluate witness testimony by attending all hearing sessions. Section5-37-5.2(e)(3) provides that:
 [i]n the event of a determination by the investigating committee of probable cause for a finding of unprofessional conduct, the accused may request a hearing (see §§ 5-37-5.3 and 5-37-5.4). A hearing committee shall be designated by the chairperson consisting of three (3) other members of the board, at least one of whom shall be a physician member and at least one of whom is a public member. If the complaint relates to a procedure involving osteopathic manipulative treatment (OMT), at least one member of the investigating committee shall be an osteopathic physician member of the board. The hearing shall be conducted by a hearing officer appointed by the director of the department of health. The hearing officer shall be responsible for conducting the hearing and writing a proposed findings of fact and conclusions of law along with a recommendation of a sanction, if warranted. The hearing committee shall read the transcript and review the evidence and, after deliberation, the hearing committee shall issue a final decision including conclusions of fact and of law. The board shall make public all decisions including all conclusions against a license holder as listed in § 5-37-6.3.
The Constitutions of both the United States and Rhode Island provide that the state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 2; R.I. Const. art. I, § 2. The Appellant asserts that his license to practice medicine constitutes a constitutionally protected property right, citing a number of federal cases in support of this contention. See Lowe v.Scott, 959 F.2d 323 (1st Cir. 1992); Beauchamp v. De Abadia,779 F.2d 773 (1st Cir. 1985); Kudish v. Bradley, 698 F.2d 59 (1st Cir. 1983). According to the Appellant, procedural due process demanded the personal presence of the Hearing Committee members at all sessions of the hearing. In the instant case, only one member of the three-member panel observed all twelve sessions of the hearing. The remaining two members each only observed one session personally — the testimony of Patient B on May 2, 2005. The Appellant claims that having all three members appear together at only one of the sessions deprived him of his right to due process.
The record evidences that the Appellant did not argue the issue of his due process rights before the Hearing Committee. The Rhode Island Supreme Court has consistently held that a court "will not consider on appeal an issue that was not raised before the trial court." East BayCmty. Dev. Corp. v. Zoning Bd. of Review, 901 A.2d 1136, 1152 (R.I. 2006) (quoting Harvey Realty v. Killingly Manor Condominium Assoc.,787 A.2d 465, 466-467 (R.I. 2001)). However, the Supreme Court has never explicitly held that the "raise-or-waive" doctrine applies to administrative proceedings. Id. at 1153. Because the instant appeal implicates an important constitutional right — the right to a fair hearing — this Court will address the ramifications of the Appellant's constitutional challenge, because the failure to raise a constitutional issue at the administrative level does not preclude its litigation in Rhode Island Superior Court. Randall v. Norberg, 121 R.I. 714, 721,403 A.2d 240, 244 (1979) (holding that an appellant of a tax administrator's decision could have alleged a due process issue for the first time while on appeal to the Superior Court).
In support of his assertion that sec. 5-37-5.2(e)(3) violates his due process rights, the Appellant relies heavily on a series of Massachusetts cases, a set of decisions from the State of New Hampshire — In re Smith, 652 A.2d 154 (N.H. 1994), and In re Grimm, 635 A.2d 456
(N.H. 1993) — and the Rhode Island Superi or Court's decision in ElGabri v. R.I. Bd. of Med. Licensure and Discipline, No. 97-4344, 1998 R.I. Super. LEXIS 36 (R.I.Super.Ct. 1998). The Appellant has misplaced his reliance on these cases.
With regard to the New Hampshire decisions, this Court notes that the statute controlling how medical board hearings should take place in New Hampshire differs from our own statute in Rhode Island. Section5-37-5.2(e)(3) specifically provides that none of the hearing committee members has to attend the hearing sessions. Instead, the statute charges the designated hearing officer with "conducting the hearing and writing a proposed findings of fact and conclusions of law along with a recommendation of a sanction, if warranted." The committee members must only "read the transcript and review the evidence" to make a final decision. In contrast, the corresponding New Hampshire statute does not involve a hearing officer as a statutorily designated fact-finder.See N.H. Rev. Stat. Ann. § 330-A:29. As noted in Grimm andSmith, the board itself has elected to make factual determinations as a hearing panel. Unlike sec. 5-37-5.2(e)(3), the New Hampshire statute does not excuse board members from attending hearings personally. Thus, the New Hampshire statute provides no guidance for this Court, particularly in light of established precedent in Rhode Island and in other jurisdictions.
Furthermore, the El Gabri decision does not call into question the constitutionality of sec. 5-37-5.2(e)(3). The Appellant asserts that the judge in that case determined that the appellant's due process rights were not violated only after the majority of the hearing committee members had heard all of the testimony and the other member had read the complete transcript of the hearing he missed. (Appellant's Memorandum of Law at 16, citing El Gabri, 1998 R.I. Super. LEXIS 36 at *27.) However, when the Superior Court decided El Gabri, sec. 5-37-5.2(e) required the hearing committee, and not the hearing officer, to conduct the hearings. Additionally, on closer inspection of El Gabri, this Court notes that the judge only offered this statement as speculation on how he might have ruled if the two members who were present during the entire testimony differed in their vote on the decision and the third absent member had to break a tie. In reality, the two members in El Gabri
actually concurred on their finding, rendering this speculation moot.
As the Appellant himself notes, the state legislature has since revised sec. 5-37-5.2(e) to remove the quorum requirement. Now, a hearing officer no longer merely conducts the proceedings. Instead, the designated hearing officer proposes findings of fact and conclusions of law. Under the current statutory provisions, the committee members need not hear testimony in order to satisfy due process. Indeed, the Massachusetts cases cited by the Appellant turned on the fact that no one charged with fact-finding or with rendering a decision evaluated the credibility of witnesses. See City of Salem v. Mass. Comm'n AgainstDiscrimination, 534 N.E.2d 283 (Mass. 1989) (remanding an agency decision for a new hearing because the hearing officer died before rendering a decision and the substitute hearing officer observed none of the hearing testimony); Dowd v. Dir. of Div. of Employment Sec.,459 N.E.2d 471, 473 (Mass. 1984) (remanding a case for further proceedings where "no one, neither the evidence taker nor the decisionmaker [sic], assessed the credibility of the witnesses"). However, under This is not the case under sec. 5-37-5.2(e) and in the instant case specifically, the appointed hearing officer satisfies the need to have a fact-finder present at all hearings.
As the Connecticut Supreme Court noted in Pet v. Dept. of HealthServs., 638 A.2d 6, 19-20 (Conn. 1994), an agency hearing satisfies a respondent's right to due process when each hearing committee member has either heard all the evidence or read the transcript in its entirety. The Pet decision implicated the due process rights of a medical professional facing the suspension of his license to practice medicine. There, the court held that "where hearings are required by statute, a board member need not be present in order to participate in decisions, if that member acquaints himself sufficiently with the issues raised and the evidence and arguments presented at the public hearing in order to exercise an informed judgment." Pet, 638 A.2d at 20.
In evaluating sec. 5-37-5.2(e)(3), this Court remains mindful that the Rhode Island Supreme Court has provided strict guidelines for investigating the constitutionality of state statutes. "In reviewing the constitutionality of statutes, `[t]he Legislature is presumed to have acted within its constitutional power.'" Gem Plumbing Heating Co.v. Rossi, 867 A.2d 796, 808 (R.I. 2005) (quoting Burrillville RacingAssoc. v. State, 372 A.2d 979, 982 (R.I. 1977)). State courts must "attach `every reasonable intendment in favor of . . . constitutionality' in order to pres erve the statute." Id. (quotingLynch v. King, 391 A.2d 117, 121 (R.I. 1978)). The party challenging the constitutionality of a statute "bears the burden of proving that the statute is unconstitutional." Id. (quoting R.I. Insurers' InsolvencyFund v. Leviton Mfg. Co., 716 A.2d 730, 734 (R.I. 1998)). Therefore, "the challenger must prove beyond a reasonable doubt that the statute is unconstitutional." Id. (citing R.I. Insurers' Insolvency Fund,716 A.2d at 734). When attacking economic legislation, such as statutes implicating property rights, the United States Supreme Court has held that "the burden is on one complaining of a due process violation to establish that the legislature acted in an arbitrary and irrational way." Duke Power Co. v. Carolina Envtl. Study Group, Inc., 438 U.S. 59,83 (1978) (quoting Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 15
(1976)).
In this case, the Appellant has not met the burden of proving beyond a reasonable doubt that sec. 5-37-5.2(e)(3) violates his constitutional rights by not requiring all members of the Hearing Committee personally to observe all testimony. Under Section 5-37-5.2(e)(3), the Hearing Officer must "[conduct] the hearing and [write] a proposed findings of fact and conclusions of law along with a recommendation of a sanction, if warranted." The statute then requires the members of the hearing committee to "read the transcript and review the evidence" and "issue a final decision including conclusions of fact and of law."
The Rhode Island Supreme Court has consistently upheld statutes requiring a hearing officer to hear evidence and make a recommended decision which the state agency either accepts, modifies or rejects.See, e.g., Goncalves v. NMU Pension Trust, 818 A.2d 678 (R.I. 2003);Envtl. Scientific Corp. v. Durfee, 621 A.2d 200 (R.I. 1993). In fact, Rhode Island courts must afford great deference to agency decisions based on the findings of fact and recommendations of the hearing officer. Goncalves, 818 A.2d at 682-683. "[R]eviewing courts will uphold administrative decisions . . . as long as the administrative interpreters have acted within their authority to make such decisions and their decisions were rational, logical, and supported by substantial evidence." Id. (citing Doyle v. Paul Revere Life Insurance Co.,144 F.3d 181, 184 (1st Cir. 1998)).
In light of the "great deference" afforded to the hearing officer's findings, the ultimate fact-finders do not have to observe all proceedings of an agency hearing. The Rhode Island Supreme Court has held that:
 in a quasi-judicial contest . . . `when a quorum of [fact-finders] reaches its decision after having access to a transcript of the hearing and also the evidence . . . [t]here is a presumption, soundly established, rationally reached, that administrative officials will properly consider the evidence before they reach a decision.' This prin ciple is in accord with the general rule that `in the absence of specific statutory direction to the contrary the deciding member or members of an administrative or quasi-judicial agency need not hear the witnesses testify. . . . The general rule is that it is enough if those who decide have considered and appraised the evidence.'
Gardner v. Cumberland Town Council, 826 A.2d 972, 979 (RI. 2003) (quoting In re R.I. Comm'n for Human Rights, 472 A.2d 1211, 1214 (R.I. 1984) and Younkin v. Boltz, 216 A.2d 714, 715 (Md. 1966)). The Supreme Court has held that fact-finders can rely on a transcript even when asked to assess the credibility of witnesses, including victims of an accused party's unprofessional conduct. See Foster-Glocester Reg'l Sch.Comm. v. Bd. of Review, 854 A.2d 1008, 1020 (finding no reason for an agency to present as witnesses the victims of a teacher's in appropriate conduct when a transcript of their testimony before an arbiter was available). Other jurisdictions have also held an agency's fact-finders do not violate a party's right to due process by relying on a transcript of an agency hearing in rendering their decision. See, e.g., GrupoIndus. Camesa v. United States, 85 F3d. 1577, 1580 (Fed. Cir. 1996) (holding that an agency's fact-finder does not have to be present to hear the testimony upon which the finding is based); Au Yi Lau v.INS, 555 F.2d 1036, 1042 (D.C. Cir. 1977) (holding that "even without agreement of the parties, a member of an administrative agency who did not hear oral argument may nevertheless participate in the decision where he has the benefit of the record before him"); NLRB v. StockerMfg. Co., 185 F.2d 451, 453 (3d Cir. 1950) (holding that an agency is permitted to make its findings and predicate its orders upon the written record without hearing the witnesses testify); Pundy v. Dept. of Prof'lRegulation, 570 N.E.2d 458, 466 (Ill.App.Ct. 1991) (holding that in a medical license suspension hearing, "[d]ue process does not require that a quorum of the decision-making board personally hear all of the evidence in order for an administrative determination to be valid"). Accordingly, this Court finds that the hearing provided to the Appellant under sec. 5-37-5.2(e)(3) did not substantially prejudice his procedural due process rights.
 II Admissibility of Alleged Hearsay Testimony
The Appellant argues that the Hearing Officer should not have admitted the testimony of Dr. Audett, Dr. Patrick, and Nurse Kelliher regarding Patient A's statements to them about the Appellant's alleged se xual misconduct. Essentially, the Appellant argues that their testimony amounts to inadmissible hearsay, because Patient A's repetition of the same statements to multiple hospital employees does not make the allegations true. See R.I. R. Evid. 801(c). Therefore, the testimony of these three witnesses unfairly prejudiced the Appellant throughout the administrative proceedings and inappropriately influenced the outcome of the hearing.
Regardless of whether the contested testimony amounted to hearsay, the Rhode Island Supreme Court has held that hearsay testimony is admissible in administrative hearings. DePasquale v. Harrington, 599 A.2d 314, 316
(R.I. 1991). In DePasquale, the Supreme Court stated that:
 [t]he admission of hearsay evidence in an administrative forum is reflective of the traditional division of function between judge and jury. Many of the rules surrounding the exclusion of hearsay in jury trials are meant to prevent juries, uninitiated in the evaluation of evidence, from hearing unreliable or confusing testimony and rendering a verdict based on such evidence. See McCormick on Evidence, §§ 351-352 at 1006-12. Such protection is far less necessary when evidence is presented to a judge sitting without a jury or, as in this case, a hearing officer with substantial expertise in the matters falling within his or her agency's jurisdiction.
Id. See also 2 Charles H. Koch, Jr., Administrative Law andPractice, § 5.52[3](a) (2d ed. 1997) ("The general rule remains that hearsay evidence is admissible in administrative hearings."). "Administrative hearings are not held to the same evidentiary standards as criminal or even judicial civil proceedings. Hearsay is quite acceptable in administrative hearings." In re Cross, 617 A.2d 97,102-103 (R.I. 1992) (citing Craig v. Pare, 497 A.2d 316, 320 (R.I. 1985)).
Section 42-35-10(a) specifically provides for circumstances in which a hearing officer can admit evidence that Rule 404(b) might otherwise exclude. Section 42-35-10(a) provides in relevant part that:
 [i]rrelevant, immaterial, or unduly repetitious evidence shall be excluded. The rules of evidence as applied in civil cases in the superior courts of this state shall be followed; but, when necessary to ascertain facts not reasonably susceptible of proof under those rules, evidence not admissible under those rules may be submitted (except where precluded by statute) if it is of a type commonly relied upon by reasonably prudent men in the conduct of their affairs. . . . (emphasis added)
Section 42-35-10(a) thereby allows for the admission of evidence if a reasonably prudent man would commonly rely on that type of evidence. The Rhode Island Supreme Court has held that "a hearing officer with `substantial expertise in matters falling within his or her agency's juri sdiction' should be able to j udge whether evidence offered is trustworthy, credible, and probative regardless of whether it is hearsay." Foster-Glocester Reg'l Sch. Comm., 854 A.2d at 1019 (quotingDePasquale, 599 A.2d at 316). The Supreme Court has consistently relied on hearing officers' "ability to exercise prudence in considering evidence and the reliability that must condition its admissibility."DePasquale, 599 A.2d at 317. Thus, this Court finds that sec.42-35-10(a) does not bar the admission of the testimony of Dr. Audett, Dr. Patrick, and Nurse Kelliher, because the Hearing Officer, acting with reasonable prudence and within her expertise, considered their testimony necessary to ascertain facts about the complaint, such as the consistency of Patient A's story and the circumstances surrounding her recounting of the incident. The Hearing Officer did not abuse her discretion by admitting the testimony of the three witnesses, and her admission of the alleged hearsay testimony was not affected by error of law.
This Court need not address the issue of whether the contested testimony amounted to hearsay. However, this Court finds that the testimony of these three witnesses does not actually constitute inadmissible hearsay. Rule 801(d)(1)(B) of the Rhode Island Rules of Evidence provides that a hearing officer can admit evidence of prior consistent statements to rebut a charge of recent fabrication or improper influence or motive by the declarant, as long as the opposing party has had the opportunity to cross-examine the declarant regarding the statement. See State v. Morey, 722 A.2d 1185, 1188 (R.I. 1999) (stating that, in a criminal context, the Supreme Court would admit testimony that simply demonstrated that the complainant's testimony never vari ed). Here, Patient A testified without objection that she recounted the incident involving the Appellant to multiple hospital staff members. (Tr. 2/18/05 at 92-93.) The Appellant's counsel later cross-examined her regarding her discussions with people in the PACU. (Tr. 2/18/05 at 138-140.) The Appellant's counsel then proceede d to challenge Patient A as to the truth of the alleged incident:
 Q. You certainly had an opportunity to tell a number of people before you actually said something to Susan [Kelliher] about three hours after you got into the recovery room, correct?
 A. I suppose so.
 Q. But you elected not to?
 A. Yes.
(Tr. 2/18/05 at 139.) The Appellant's counsel then questioned Patient A about how she made her comments to people at the hospital:
 Q. Now, you indicated that you made comments to a number of people in the hospital and I think we went through a litany of people that you allegedly talked to. Did you ever give any written statement to anyone in the hospital as to what allegedly occurred to you?
 The Witness: A written statement?
 Mr. Carroll: Written statement.
 The Witness: While I was at the hospital, is that —
 Mr. Carroll: At any time while you were in the hospital. While you were at the hospital did you make a written statement?
 A. No.
(Tr. 2/18/05 at 139.) The testimony of Dr. Audett, Dr. Patrick, and Nurse Kelliher concerns Patient A's recounting of the al leged incident. Their statements provide evidence of Patient A's prior consistent stat ements used to rebut a charge of recent fabrication or improper motive by opposing counsel. Therefore, their testimony does not constitute hearsay, and the Hearing Officer did not abuse her discretion or make an error of law by admitting their testimony into the record.
 III. Admissibility of Patient B's Testimony
The Appellant argues that the Hearing Officer erroneously admitted into evidence the testimony of Patient B. The event about which Patient B testified occurred several years prior to Patient A's surgery, and neither the local police nor the hospital ever filed charges or took disciplinary action against the Appellant. Patient B testified that the Appellant sexually molested her during a surgical procedure at Wing Memorial Hospital in Palmer, Massachusetts in August 2000. She asserted that after receiving anesthesia from the Appellant, he started talking to her and asking questions regarding her family, her relationships, and her tattoos. Although she acknowledged giving permission for him to see a tattoo on her stomach, she thought he would view the tattoo by lifting the side of her johnny. According to her testimony, he instead lifted the johnny from her neck area and proceeded to fondle her breasts, even after she told him not to touch her in that manner. She also stated that he asked her not to tell anyone about his actions because he could "get in a lot of trouble." She claims that no one else in the operating room could observe the Appellant's actions, because the other operating room staff were on the other side of a surgical drape from Patient B and the Appellant. She later reported the incident to the Palmer Police Department and signed a police statement detailing her allegations against the Appellant.
The Appellant asserts that pursuant to sec. 42-35-10(a), the hearing officer must follow the Superior Court's Rules of Evidence, which he claims would bar the admission of Patient B's testimony. The Appellant claims that her testimony unduly prejudiced him, because her statements amounted to inadmissible character evidence under Rule 404(b) of the Rhode Island Rules of Evidence. To support this contention, the Appellant relies on State v. Quattrochi, 681 A.2d 879 (R.I. 1996) (holding that the trial court improperly admitted evidence of two uncharged sexual encounters with other children because the evidence had no independent relevance that was reasonably necessary to prove the elements of the crimes charged).
Section 42-35-10(a) specifically provides for circumstances in which a hearing officer can admit evidence that Rule 404(b) might otherwise exclude. Section 42-35-10(a) provides in relevant part that "when necessary to ascertain facts not reasonably susceptible of proof under [Superior Court Rules of Evidence], evidence not admissible under those rules may be submitted (except where precluded by statute) if it is of a type commonly relied upon by reasonably prudent men in the conduct of their affairs." As previously noted, "a hearing officer with `substantial expertise in matters falling within his or her agency's jurisdiction' should be able to judge whether evidence offered is trustworthy, credible, and probative regardless of whether it is hearsay." Foster-Glocester Reg'l Sch. Comm., 854 A.2d at 1019 (quotingDePasquale, 599 A.2d at 316). Thus, this Court finds that sec.42-35-10(a) does not bar the admission of Patient B's testimony, because the Hearing Officer, acting with reasonable prudence and within her expertise, considered the Testimony of Patient B necessary to ascertain facts about the Appellant, such as the similarity of the experiences Patient A and Patient B had with the Appellant.
Additionally, the Appellant attacks the credibility of Patient B's testimony, citing the testimony of Nurse Stitsinger, who claims she stayed within approximately two feet of the Appellant and had a clear view of both the Appellant and Patient B throughout the surgical procedure. The Appellant also raises the fact that both Wing Memorial Hospital and the Palmer Police Department investigated Patient B's claims and decided not to pursue disciplinary action or file charges against the Appellant. Courts may not substitute their judgment for that of an agency with respect to the credibility of a witness.Tierney v. Dep't of Human Servs., 793 A.2d 210, 213 (R.I. 2002). Therefore, this Court will make no new determinations as to the credibility of Patient B when the Hearing Committee has already considered her testimony credible.
Even if this Court were to follow the Appellant's assertions and consider the evidence under Rule 404(b), this Court would still find Patient B's testimony admissible. Rule 404(b) provides that:
 [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or to prove that defendant feared imminent bodily harm and that the fear was reasonable.
The Rhode Island Supreme Court has held that courts may admit evidence of uncharged sexual conduct admitted to show motive, intent, and a plan to engage in sexual molestation, even if the uncharged incident occurred many years previously. See State v. Hopkins, 698 A.2d 183, 185 (R.I. 1997) (admitting evidence of the uncharged sexual molestation of a child occurring ten years prior to the incident before the trial court). A trial justice may conclude that evidence of a defendant's sexual misconduct with another victim "is also admissible under certain limited circumstances when it tends to establish that the charged misconduct was part of a common scheme or plan directed against victims under the defendant's control." State v. Rice, 755 A.2d 137, 145 (R.I. 2000) (citing Hopkins, 698 A.2d at 185). Courts may also consider "evidence of uncharged sexual misconduct [when used] to show `lustful disposition or sexual propensity.'" State v. Morey, 722 A.2d 1155, 1189 (R.I. 1999) (quoting State v. Toole, 640 A.2d 965, 971 (R.I. 1994)).
In the instant matter, the accusations of Patient A and Patient B exhibit a high degree of coincidence. The two incidents involved young, female patients in the Appellant's care when he had overwhelmi ng control over them. Their testimony noted that he asked them similar, overly familiar questions about their personal relationships before fondling their breasts. Each patient stated that he reached for her breasts via the neck-opening of her johnny while a surgical drape concealed the Appellant and his patient from the direct view of the other medical staff in the operating room. Furthermore, in both cases, Patient A and Patient B testified that the Appellant admonished them not to talk about the molestation because he could get into considerable trouble. In light of the strong similarities in the allegations of Patient A and Patient B against the Appellant, admitting Patient B's testimony under one or more of the Rule 404(b) exceptions, such as motive, opportunity, intent, or identity, did not constitute an abuse of discretion and was not affected by error of law.
 IV. References to the Appellant's Criminal Trial
The Appellant calls special attention to the verdict of his criminal trial, decided several months after the agency decision here on appeal. (Appellant's Memorandum of Law at 2-3, 51-53.) In the criminal trial, a jury found the Appellant not guilty of sexually assaulting Patient A, apparently after approximately ten minutes of deliberation.Id. at 3. Although this Court duly notes the swiftness of the verdict in the criminal trial, the Appellant's criminal trial and its outcome have no bearing on the instant matter — the Appellant's administrative appeal of an agency decision.
 Courts have consistently held that:
 [a] trial and conviction in a court of competent jurisdiction is not a condition precedent to a proceeding by the state board of health against a physician to revoke his license for any of the causes provided by statute. Even an acquittal of a physician in a prosecution for criminal acts does not preclude the institution of proceedings for the revocation of his license to practice medicine based upon the same acts.
61 Am. Jur. 2d Physicians, Surgeons, and Other Healers § 89 (2006). As noted by the Rhode Island Supreme Court in the analogous context of attorney disbarment proceedings, "disciplinary proceedings are civil in nature, designed primarily to protect the members of the public from the actions of attorneys who are unwilling or unable to conform their conduct to the standards of professional conduct adopted by this court for the welfare of the public." Lisi v. Bashaw, 599 A.2d 1038, 1040
(R.I. 1991). The reasoning in Lisi extends to medical professionals as well. See, e.g., Murphy v. Bd. of Med. Examiners, 170 P.2d 510, 514
(Cal.Ct.App. 1946) (holding that a medical board's decision to revoke a physicians license "is an administrative, disciplinary proceeding, and is not criminal in its nature, nor is it to be judged by the legal standards applicable to criminal prosecutions"); Thangavelu v. Dept. ofLicensing Regulation, 386 N.W.2d 584, 589 (Mich.Ct.App. 1986) (holding that "an administrative proceeding against a [licensed physician] is a different cause of action than a criminal proceeding against the same licensee, even if based on the same facts which resulted in acquittal of licensee in the criminal case"); Younge v.State Bd. of Registration for Healing Arts, 451 S.W.2d 346, 349 (Mo. 1969) (holding that "revocation proceedings by the State Board of Registration for the Healing Arts are not penal" or "quasi-criminal"). Like the Supreme Court in Lisi, this Court will not apply the findings of a criminal court — with its strict rules of evidence and standards for finding guilt only beyond a reasonable doubt — to disciplinary proceedings against a professional. Therefore, the Appellant's argument with respect to the applicability of his criminal trial has no merit.
 V. Alleged Incorrect Factual Findings in the AgencyDecision
The Appellant argues that the Board has made an arbitrary or clearly erroneous decision based on allegedly incorrect findings of fact. The Appellant cites inconsistencies between the Administrative Decision and actual testimony and evidence given during the hearing. Specifically, the Appellant questions the following allegedly incorrect factual findings:
 (1) The Administrative Decision found that the Appellant initiated a conversation involving Christmas shopping, although Patient A testified that this conversation did not occur;
 (2) The Administrative Decision noted that someone removed a television monitor following the completion of the arthroscopic phase of the surgery, but no one testified about this removal.
 (3) The Administrative Decision misrepresents the configuration of the surgical drape; and
 (4) Patient B contacted the Board due to a call from a doctor at Wing Memorial Hospital, not because she read about the Appellant's Summary Suspension.
The Appellant argues that these alleged errors demonstrate that the Board did not base its decision on competent or credible evidence. However, this Court finds that the alleged inconsistencies amount only to harmless errors that did not substantially prejudice the Appellant.
An agency must not make arbitrary decisions. C-Line, Inc. v.United States, 376 F. Supp. 1043, 1049 (D.R.I. 1974). Therefore, this Court may set aside agency decisions that are irresponsible or based on inadequate findings of fact. Id. However, in order for this Court to find that the agency acted arbitrarily, the agency must have made a clear error in judgment. Citizens to Preserve Overton Park, Inc. v. Volpe,401 U.S. 402, 416 (1971). Incompetent evidence becomes prejudicial "only when it reasonably appears that the incompetent evidence so influenced the judgment of the trial justice as to have caused him to rest his decision in whole or substantial part on that evidence." Corrado v. ProvidenceRedevelopment Agency, 110 R.I. 549, 556-557, 294 A.2d 387, 391 (1972) (citing Nugent ex rel. Hurd v. City of East Providence, 103 R.I. 518,528, 238 A.2d 758, 764 (1968); New England Box Barrel Co. v. TravelersFire Ins. Co., 63 R.I. 315, 321-322, 8 A.2d 805, 808 (1939); New EnglandTransportation Co. v. Doorley, 60 R. I. 50, 56, 197 A. 205, 208 (1938)). In the instant matter, the Board did not render an arbitrary or capricious decision because the record presents reliable, probative, and substantial evidence to support the Board's decision, evenwithout the alleged inconsistent factual findings. Accordingly, the Board's de cision was not clearly erroneous.
 VI. The Weighing of Evidence and Testimony by the HearingCommittee
The Appellant argues that the administrative record provides no competent and credible evidence to support the Hearing Committee's conclusion that the Appellant molested Patient A. The Hearing Committee found that the Appellant committed an act of unprofessional conduct based on the factual testimony of the alleged victim, hospital staff, a prior patient of the Appellant, and the expert testimony of an anesthesiologist.
However, the Appellant highlights instances of supposedly inaccurate, contradictory and incompetent testimony by Patient A — the result of Patient A's misperceptions while under medication. He points to specific instances of witness testimony that allegedly directly contradict Patient A's al legations. The Appellant also attacks the credibility of Dr. Hittner and her opinions regarding the dosages of medications used by the Appellant on Patient A and the supposed causal link between the medication Propofol and sexual fantasies in patients administered the drug. The Appellant disputes Dr. Hittner's contention that instances of patients' sexual fantasies while on Propofol are rare and anecdotal by stressing the case studies and the first-hand knowledge of his own experts. In essence, the Appellant argues that in light of the all the testimony and other evidence presented during the twelve sessions of the Appellant's hearing, the Board made an arbitrary and capricious decision to revoke the Appellant's license to practice medicine.
The Rhode Island Supreme Court has consistently upheld the limited scope of the "arbitrary and capricious" standard of review and affords great deference to agency decisions. Goncalves, 818 A.2d at 682-683. "Use of the arbitrary and capricious standard means that reviewing courts will uphold administrative decisions . . . as long as the administrative interpreters have acted within their authority to make such decisions and their decisions were rational, logical, and supported by substantial evidence." Id. (citing Doyle, 144 F.3d at 184). In a "credibility war" between opposing parties, discrepancies in trial testimony and other evidence contained in the record do not rise to a level to warrant second-guessing a hearing officer's credib ility findings unless the hearing officer overlooks material evidence or is otherwise clearly wrong. See Connor v. Bjorklund, 833 A.2d 825, 828
(R.I. 2003) (upholding a trial judge' s decision to set aside jury findings in conflict with those of the trial judge and order a new trial).
In the instant matter, the Hearing Committee heard from numerous witnesses. Both Patient A and the Appellant testified before the Hearing Committee. The Hearing Committee also considered testimony from doctors and nurses acquainted with the incident, as well as Patient B, who alleges that Appellant sexually molested her while under his care. Both sides also presented expert testimony from professional anesthesiologists regarding the Appellant's treatment of Patient A and the dosages and effects of the medications he administered to her. Additionally, the Hearing Committee reviewed dozens of exhibits, including medical literature. Furthermore, throughout the hearing, the Appellant had the opportunity to call witnesses on his behalf and submit evidence to substantiate his claims and refute those of Patient A.
As required by statute, the Hearing Officer personally conducted all twelve sessions of the hearing. Moreover, the Hearing Officer provided a detailed proposed findings of fact, as well as a thorough analysis of these findings. The Hearing Officer explained in considerable detail the evidence that the Hearing Committee used in adopting its decision. The members of the Hearing Committee all signed an affidavit certifying that they reviewed the entire record before rendering their decision. Moreover, one Hearing Committee member attended all twelve hearings, even though sec. 5-37-5.2(e)(3) only requires committee members to "read the transcript and review the evidence." Furthermore, all members of the Hearing Committee and the Hearing Officer personally observed the testimony of Patient B and could directly assess her credibility. Upon a full examination of the Hearing Committee's decision, this Court finds that the Hearing Committee's determination that A ppellant committed unprofessional conduct in the practice of medicine was not arbitrary and capricious.
 CONCLUSION
After thoroughly reviewing the entire record, this Court holds that the Board based its decisions on reliable, probative, and substantial evidence in the record and that its findings were not affected by error of law. The Board' s decision was not arbitrary or capricious or characterized by an abuse of discretion. Thus, the Appellant's substantial rights have not been prejudiced. For the reasons stated above, this Court affirms the Board's decision finding that the Appellant se xually molested Patient A in violation of sec. 5-37-5.1, both in general and specifically subsections (7), (19), and (30) thereof. Counsel shall prepare an appropriate judgment for entry.
[1] The Director's Summary Suspension Order also included charges that the Appellant violated professional boundaries by asking a patient on a date and engaged in unprofessional conduct by asking a female hospital employee to view pornography with him on a hospital computer. The parties involved presented testimony to the Hearing Officer and Hearing Committee on both additional charges. However, the Board declined to rule on either matter. For the purposes of the decision now on appeal, the Hearing Officer and the Hearing Committee focused solely on the charge that the Appellant sexually molested a patient. Accordingly, this Court will consider only those portions of the record that address the molestation charge.
[2] johnny: a short-sleeved collarless gown with an opening in the back for wear by persons (as hospital patients) undergoing medical examination or treatment. Merriam-Webster's Medical Dictionary
(Merriam-Webster, Inc.), available at http://dictionary.reference.com/browse/johnny (last accessed Dec. 7, 2006).
[3] arthroscopy: medical procedure involving the use of a surgical instrument for the visual examination of the interior of a joint (as the knee). Merriam-Webster's Medical Dictionary (Merriam-Webster, Inc.),available at http://dictionary.reference.com/browse/arthroscopy (last accessed Dec. 7, 2006).
[4] EKG leads and electrodes: equipment attached to a patient's body for the purpose of making a graphic recording of the electrical activity of the heart, used to evaluate cardiac function. See The AmericanHeritage Science Dictionary. (Houghton Mifflin Co.), available at http://dictionary.reference.com/browse/electrocardiogram (last accessed Dec. 7, 2006).
[5] Anesthesia staff members at Kent County Hospital are not hospital employees. The anesthesia staff operates as an independent group that contracts with the hospital to provide anesthesia services.
[6] Wing Memorial Hospital is a member of the UMass Memorial Health Care system.
[7] Dr. Hittner did not provide any testimony with respect to Patient B and the Wing Memorial Hospital surgery as the circumstances involving that incident became known to the State only after Dr. Hittner's test imony. (Administrative Decision at 22.)
[8] The Physician's Desk Reference lists "amorous behavior" associated with the use of Propofol has having an "incidence less than 1% — Causal Relationship Unknown."
[9] endoscopy: visual examination of the interior of a body cavity or a hollow organ such as the colon, bladder, or stomach by means of a rigid or flexible tube fitted with lenses, a fiber-optic light source, and often a probe, forceps, suction device, or other apparatus for examination or retrieval of tissue. The American Heritage ScienceDictionary (Houghton Mifflin Co.), available at http://dictionary.reference.com/browse/endoscopy (last accessed Dec. 7, 2006).
[10] A "patient drape" covers a surgical patient like a blanket. It differs from a "surgical or sterile drape," which rises at a ninety degree angle to a patient and separates the patient's upper body from the surgical field.
[11] Certified Registered Nurse Anesthetist.